IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 19, 2016 Session
Remanded by the Supreme Court, October 19, 2016

**STATE OF TENNESSEE v. RANDALL T. BEATY**

**Appeal from the Criminal Court for Sumner County**
**No. 156-2012      Dee David Gay, Judge**

_____

**No. M2014-00130-CCA-R3-CD – Filed November 8, 2016**

_____

Defendant, Randall T. Beaty, was indicted for first degree felony murder and aggravated child abuse. After a jury trial, he was convicted of reckless homicide and aggravated assault, which were charged to the jury as lesser[-]included offenses. He received consecutive sentences of four years for Class D felony reckless homicide and six years for Class C felony aggravated assault, for an effective ten-year sentence to be served in the Department of Correction. On appeal, Defendant argued: (1) that the evidence was insufficient to support his convictions; (2) that the trial court erred by allowing Detective Bachman to testify in violation of the rule of sequestration; (3) that the trial court erred by excluding a proffer by Amber Peveler; (4) that the trial court erred in failing to merge his convictions on double jeopardy grounds; and (5) that the trial court erred by ordering consecutive sentencing. As to the alleged violation of the rule of sequestration, we held, pursuant to State v. Jordan, 325 S.W.3d 1, 40 (Tenn. 2010), that the State had the right under Tennessee Rule of Evidence 615 to designate an investigating officer as exempt from sequestration and the designated investigating officer can remain in the courtroom during the testimony of other witnesses. We further recognized, as a matter of plain error, that the jury's verdict for aggravated assault failed to specify the *mens rea* with which the Defendant acted, and a majority of the panel concluded that the Defendant's judgment of conviction for knowing aggravated assault, a Class C felony, should be modified to reflect a conviction for reckless aggravated assault, a Class D felony. We, therefore, modified the conviction in Count 2 to a Class D felony reckless aggravated assault and modified Defendant's sentence in Count 2 to four years' incarceration to be served consecutively to the four year sentence for reckless homicide. Finally, we concluded that the conviction for reckless aggravated assault did not merge with the conviction for reckless homicide and affirmed all other aspects of Defendant's

convictions. On October 19, 2016, the Tennessee Supreme Court granted Defendant's application for permission to appeal and remanded the case to this court for reconsideration in light of the supreme court's recent opinion in State v. Howard, No. E2014-01510-SC-R11-CD, __ S.W.3d __, 2016 WL 5933430 (Tenn. Oct. 12, 2016). Upon reconsideration in light of Howard, we conclude that Defendant's conviction for reckless aggravated assault must merge with his conviction for reckless homicide. The judgments of the trial court are affirmed as modified, and the case is remanded for entry of amended judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified; Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. THOMAS T. WOODALL, P.J., concurred in part and dissented in part and filed a separate opinion.

Brittney S. Hollis and Rob McKinney, Nashville, Tennessee, for the appellant, Randall T. Beaty.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and Thomas Boone Dean and Jayson Criddle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION ON REMAND**

**Background**

In June of 2010, Amber Peveler was living with her parents, Michael and Deborah Needel, and her two daughters: the victim, who was born in January 2010, and L.P., who was born on May 25, 2008. Because the victim and her sister are both minors, we will not use their names. At the time, Ms. Peveler was separated from her husband, Chad Peveler, because she came home from work one day and found a Lortab pill on the floor of their home that had fallen out of Mr. Peveler's pocket. Ms. Peveler explained that Mr. Peveler was addicted to pain pills, and she told him to leave because the two children were always on the floor, and one of them could have put the pill into her mouth.

At the time of the separation from her husband, Ms. Peveler had worked for Walmart in Hendersonville for approximately seven years and had become the store's customer service manager. While working at Walmart, Ms. Peveler met Defendant, and they became friends in March 2010. After her separation from her husband, Ms. Peveler began spending more time with Defendant. One day in September 2010, Defendant called Ms. Peveler and asked if she would be his girlfriend, and she said, "yes." Ms. Peveler testified that Defendant was "good with the kids, and . . . took them to the park." She also cleaned Defendant's apartment, washed his clothes, and gave him "[q]uite a bit" of money.

Ms. Peveler testified that Defendant was in drug rehab in July 2010, and she began giving him Lortab pills from a prescription that she had for back pain. Ms. Peveler said that Defendant told her that he needed the pills for his knee pain. Defendant later told her that he was addicted to Lortab and Dilaudid. In October 2010, Ms. Peveler began buying pills for Defendant from Marlon Thompson. She knew Mr. Thompson through a co-worker at Walmart. Ms. Peveler admitted that she took the victim and L.P. with her to buy pills from Mr. Thompson on multiple occasions.

Ms. Peveler testified that while she was working, her parents or grandmother cared for the victim and L.P. She spent time with Defendant during the month of October 2010, and on one occasion, she and the children spent the night at Defendant's apartment. Ms. Peveler testified that she noticed bruises on the victim, including her neck, sometime between October 17 and 23, 2010. Ms. Peveler testified that, even though she made "good money" working at Walmart and she lived rent-free with her parents, she began having financial difficulties because she was giving so much money to Defendant. She began stealing from Walmart and eventually lost her job and was arrested for theft on Monday, October 25, 2010. Although she had no income, Ms. Peveler continued giving money to Defendant.

Ms. Peveler testified that the victim and L.P. were with her October 26-28, 2010, and they spent time at Defendant's apartment. She said that on October 26, 2010, she and Defendant "just hung out and played with the kids." Ms. Peveler testified that she and the children spent the night at Defendant's apartment that night and they remained at the apartment for most of the following day, Wednesday, October 27, 2010. Ms. Peveler and the children later met Ms. Peveler's mother, Deborah Needel, for dinner at Pizza Hut in Rivergate. Ms. Peveler noted that on Wednesday, October 27, Defendant slipped and fell while carrying the victim to the car. Her upper lip hit Defendant's collar bone and was bleeding. She also noted that on Tuesday or Wednesday, October 26-27, the victim

- 3 -

fell off the couch and hit the back of her head on the floor at Mrs. Needel's home. However, there were no unusual effects following those events.

On Thursday, October 28, 2010, Ms. Peveler, the victim, and L.P. spent most of the day with Defendant. Ms. Peveler and the children later met Mrs. Needel for dinner at Captain D's in Gallatin. At dinner, the victim got sick and vomited. Ms. Peveler thought that the victim had a french fry stuck in her throat. Later that evening, Ms. Peveler and Mrs. Needel were giving the victim and L.P. a bath. Ms. Peveler noted that the victim was acting "[l]ike a baby, splashing and playing around, playing with her toys." Ms. Peveler did not notice any ill effects of the victim from having vomited earlier. However, when Mrs. Needel took the victim out of the bathtub she noticed bruising on the victim's left buttock.

Ms. Peveler testified that on October 29, 2010, she was putting the victim and L.P. down for a nap at approximately 12:30 p.m. when Defendant called and asked her to buy more pills from Mr. Thompson. She said Defendant was going to sell the pills in order to make some money to pay her back $200 that he owed her so that she could make her car payment. Ms. Peveler called Mr. Thompson and arranged to meet him at the Walmart in Hendersonville at 5:00 p.m. Ms. Peveler testified that she and the two children fell asleep and awoke at approximately 3:30 p.m. Defendant called and asked when they were going to leave the house. He continued calling her until she arrived at his apartment with the victim and L.P. Ms. Peveler testified that she arrived at Defendant's apartment at approximately 4:30 to 4:45 p.m. and Defendant met her at the truck. He gave her $80 to purchase the pills and asked if L.P. could stay with him. When L.P. refused to stay, Defendant asked if the victim could stay with him, and Ms. Peveler agreed. Defendant then took the victim out of the truck, still in her infant carrier, and took her inside the apartment. The victim was awake at the time, and Ms. Peveler was talking to her.

Ms. Peveler then drove to the Hendersonville Walmart to meet Mr. Thompson. He walked up to her car window, and she told him that she did not have enough money to purchase the eight pills as originally requested and that she wanted to purchase six. Ms. Peveler testified that Mr. Thompson spoke to L.P. and asked about the victim. Ms. Peveler then told Mr. Thompson that the victim was with Defendant. After the transaction, Ms. Peveler spoke with Defendant and told him that she was driving back to his apartment. When Ms. Peveler arrived at Defendant's apartment, he walked outside to get L.P. and help with the diaper bag. She walked into the apartment and saw the victim sleeping in her infant carrier at the end of the couch. Ms. Peveler asked Defendant to lay the victim down in the back bedroom while she cooked some Ramen noodles for L.P. Defendant then took the victim out of the infant carrier and placed her in the back

- 4 -

bedroom. Ms. Peveler gave Defendant the pills that she purchased, and he placed them in a cellophane cigarette package. While Ms. Peveler fed L.P., Defendant was on the phone. He then announced that they needed to "meet a guy to buy the pills." Ms. Peveler went to the back bedroom to get the victim, and she noticed that "something wasn't right." She testified:

> [The victim] was at an angle here at the end of the bed, and she was laying on her back, and I never put [the victim] on her back. She always laid on her belly.
>
> .   .   .
>
> [Defendant] had placed a pillow on the right side of her—no, her left side, but right here. And a pillow over top of her head. And he had placed a blanket on her, but it was weird how he put the blanket because the blanket was up to her chest and her hands were outside of the blanket. Instead of just leaving her fully covered, her hands were, like, by her side.

Ms. Peveler testified that she tried to wake the victim but the victim did not respond. Ms. Peveler then opened the victim's eyelids and noticed that her pupils were extremely dilated. She picked the victim up and carried her into the hallway and told Defendant that something was wrong with the victim. Defendant looked at the victim and walked into the kitchen to get a cup of water. He sprinkled some of the water on the victim's face, but she did not move. Ms. Peveler placed the victim on the floor, and Defendant determined that she was not breathing. He performed CPR on the victim, and when Ms. Peveler suggested that they call for an ambulance, Defendant said that they would drive the victim to the hospital. Ms. Peveler then picked up the victim, and Defendant drove them and L.P. to the emergency room.

When they arrived at the hospital, Defendant dropped Ms. Peveler and the victim off at the emergency room entrance while he and L.P. parked the truck. Ms. Peveler walked inside the emergency room and told a staff member that the victim was unresponsive. The victim was immediately taken away to a room for treatment. At some point, Defendant walked into the room and began yelling and cursing. A nurse told Defendant to calm down or he would have to leave. Ms. Peveler and Defendant then walked outside to smoke while the victim was taken for a CT scan. Ms. Peveler testified that while they were outside, Defendant suggested that they tell the following story: "It was that I [Ms. Peveler] had the girls the whole time, that I never left [the victim] with

- 5 -

[Defendant], that we were supposed to go get pizza, and that's when I found [the victim]. I was the one that put her down for a nap." After the victim returned from having the CT scan, Ms. Peveler asked Defendant to leave because Mr. Peveler would soon be arriving at the hospital. Ms. Peveler was then advised that the victim had bleeding on the left side of her brain, and she was having seizures and that she would be taken by LifeFlight to Vanderbilt Children's Hospital.

Ms. Peveler's mother drove Ms. Peveler and L.P. to Vanderbilt, and they were joined by Mr. Peveler and other relatives. During that time, Ms. Peveler was texting Defendant. Later that night, Mr. and Ms. Peveler were advised how serious the victim's injuries were. Throughout the evening, Ms. Peveler continued texting Defendant "[a]bout how [they] needed to stick to the story." On Saturday evening, October 30, 2010, Ms. Peveler met with detectives at the Hendersonville Police Department. She "told them the first story that [Defendant] had said that we needed to stick to." But "[t]hey knew it wasn't the truth." During a smoke break, Ms. Peveler phoned her friend, Rebecca Wyatt, and she asked Ms. Wyatt to tell police that she met Ms. Peveler at Walmart to give her some gas money. However, Ms. Wyatt was not willing to lie for her. Ms. Peveler finally told Mr. Peveler the truth about what happened, and then she told police.

After meeting with police in Hendersonville, Ms. Peveler returned to Vanderbilt to be with the victim. She testified:

> The doctors met with us and said that they were going to do their second brain test.
>
> .   .   .
>
> They brought in a person that looks at their eyes. And he said that the retinas were detached from her eyes. And that there was no eye movement. There was bleeding from behind her eyes. And then, once he left, they took her off the breathing machine and she quit breathing and then they hooked her back up.
>
> .   .   .
>
> The doctor pronounced her dead at 12:41 a.m. Sunday morning.

- 6 -

After the victim was pronounced dead, her body was maintained on a breathing machine to preserve her organs for transplant.

Colby Carroll, a nurse at Hendersonville Medical Center's Emergency Room, testified that she was working on October 29, 2010, when the victim was brought into the hospital. She said:

> I remember—I remember the event because, fortunately, it's not one that you see very often. Just the emotion from it will stick with you for a very long time. It was a—it stands out pretty vividly, actually.
>
> One of our—our triage nurses or the area that you start out in when you come into the ER, that little section there where you sit with the nurse, tell them what's going on, how long it's been going on, that kind of thing—the lady that was out front came back with a small child in her arms, brought her into room 1, said she needed help because the child was unresponsive. The mother was in tow at that point.
>
> She came into the room and they laid her down and we began working on her at that point. The biggest thing that stands out really though is the reaction of the mother's boyfriend at the time that it all occurred.
>
> . . .
>
> Me and Dr. Harrison, who was the attending [physician] that night, were trying to establish some sort of intravenous access, a way to give medications to the patient that would work effectively and quickly. We were on the far side of the bed. The boyfriend of the mother came running through the door, yelling and screaming, that kind of thing, cussing, and was just very, very aggressive.
>
> . . .
>
> Generally, when you have upset parents, that kind of thing, you have victims of trauma that come in, and parents will come in the door, that kind

of thing.  They can be very, very loud.  And it's just, you know, parents' protective behavior, you know.  But the thing that got me with him was that he didn't—he never looked at her.  He screamed and he yelled at us, cussing, that kind of thing, but her never looked at her.

When you have a parent that comes in and is scared for their child, they may be yelling, but they're looking at the child.  They look at them and say, "What's going on?  Why are they doing this?  Why are they doing that?"  That was never the case at that point.

It didn't last very long, but I will remember it.  And at that point we asked him to leave.  The anger was there; the concern wasn't.

Ms. Carroll noted that the victim arrived at the hospital at approximately 5:50 p.m. on October 29, 2010.  Her notes contained the following history concerning the victim:

According to this, the mother stated that the patient had two emesis, which is a case of vomiting.  She had two cases of vomiting yesterday.  Drank a bottle, however, the night before and then that morning without any difficulty.  And then stated that the patient was taking a nap.  The mother placed the patient in a car seat and then went back to the patient and was not responsive and they brought them into the hospital.

Ms. Carroll testified that the victim was "posturing" when she arrived at the emergency room.  She explained that "posturing" is similar to a seizure and is an indication of either "head injury or seizure or both.  One could be caused by the other."  Ms. Carroll noted that there was bruising on the victim's neck and buttocks.  A physical assessment reveled that the victim was not responsive to any sort of stimulus.  The reason for the victim's non-responsiveness was head trauma.

Ms. Carroll testified that the victim stopped breathing on her own at 6:05 p.m., and "at that point, respiratory was bagging her not for support but for life sustaining measures."  She noted that various measures were taken to sustain the victim's life such as the placement of an intraosseous line to inject fluids directly into the victim's bone marrow, the use of atrophine to raise her heart rate, and intubation to assist with her breathing.  The victim received a CT scan and, once stabilized, was transported by LifeFlight to Vanderbilt Children's Hospital at 7:10 p.m.

Dr. Duane Harrison, an emergency room doctor at Hendersonville Medical Center, was qualified as an expert in emergency medicine. He testified that while the victim was in the emergency room "either a family member or someone that came in, was somewhat belligerent, and I rather sternly asked him to remove or be removed." Dr. Harrison further noted that the person "was making demands, he was using profanity, and it wasn't something that we needed at the time, and it was distracting to what I was trying to get my team to do."

Dr. Harrison went through the examination process of the victim in detail. He noted that there was "bruising on her neck, on her glute or butt cheek and in the inguinal area right below her stomach as well on the left." Dr. Harrison testified:

> And that is put there because it is inconsistent with what I hear, but not just because it's inconsistent. It's when I ask if the child has fallen, has there been any injury, and I hear no, and then I see the bruising. I'm putting it there to reflect why. And it's also so I can go back and make sure I check that something else hasn't happened.

He did not notice any blunt trauma to the victim's head.

Concerning the results of the victim's CT scan, Dr. Harrison testified:

> Well, what it says is there's a large frontel parietal and temporal, temple, area subdural hematoma. That just means that underneath one of the coverings of the brain—and there are three—there has been some bleeding. And the bleeding itself is problematic, but not as—it's problematic—it's problematic in the fact that it indicates something has happened, but what is more problematic is what it does to the brain. Because it accumulates, it has to make way for the space it needs so it accumulates. And as it accumulates, it begins to push—it begins to push the brain out of the way.

> And that's what we're seeing when they say there's a mass effect, meaning we stick a mass down in there that shouldn't be there—blood, and we make way for it by pushing the brain to the other side. And pushing the brain causes some of the things that we worry about. It causes the loss of consciousness, it causes depression of the breathing, it causes the abnormal posturing that we see in her extremities.

- 9 -

And so we now have a reason for why we might see some of the things that we see there. There's something that has happened that has caused the bleeding to occur and that's why the scan is there, and that's what it showed us shortly after we obtained it.

Dr. Harrison testified that the victim's skull was not fractured which he did not find unusual. He explained that the bone structure of a nine-month-old baby is different than that of an adult:

Well, the bones are softer, but they're also not fused, for lack of a better word, so that there is play to allow the head to grow. There are growth plates and suture lines, and it is not uncommon to see intracranial problems without trauma, some because of the softness of the bone and the ability for it to move in and out, but the other is that there is a significant number of cases that we see that we see this in what we call shaken baby syndrome. In fact, it's one of the hallmarks in shaken baby syndrome where the rotation itself causes tearing and the bleeding occurs from that instance.

So while we frequently see patients without obvious head trauma, we also see those same patients with intracranial problems like bleeding and bruising that occur simply from the mechanism of trauma, and the mechanism of trauma can be rotational and shaken baby syndrome is probably the one at the top of the list.

Sergeant John Coarsey of the Hendersonville Police Department testified that during the early morning hours of October 30, 2010, he was asked to conduct an interview with Defendant. At approximately 4:00 a.m., Sergeant Coarsey and a patrol officer approached Defendant's apartment and knocked on the door. Defendant answered the door and was "very cordial" inviting the officers inside. The apartment was in disarray, and there was a woman that Defendant identified as his "girlfriend" asleep in the back bedroom. Sergeant Coarsey identified a recording of the interview he conducted with Defendant which was played for the jury. Defendant also wrote out a statement which had been misplaced and was not available for trial. Sergeant Coarsey testified that Defendant was cooperative and cordial during their interaction with him.

- 10 -

Detective Tim Bailey of the Sumner County Sheriff's Office testified that on the morning of October 30, 2010, he was asked to help investigate the present case. He interviewed Ms. Peveler's parents and the victim's grandparents, Mike and Deborah Needel. He also photographed Ms. Peveler's bedroom and the couch from which Ms. Peveler said that the victim fell the previous Wednesday. Mrs. Needel stated that she witnessed the victim's fall from the couch.

Detective Bailey testified that he photographed the victim's car seat or infant carrier and collected it as evidence. He also obtained consent to search Ms. Peveler's cell phone. The phone was taken back to the Sheriff's Office, and they "basically made a mirror copy of it with some software that the sheriff's department has." The phone contained certain text messages from Defendant to Ms. Peveler which Detective Bailey read into the record. Detective Bailey testified that according to medical records, the victim arrived at the emergency room at 5:50 p.m. on October 29, 2010. At 7:24 p.m. that same night, Defendant sent the following text message to Ms. Peveler: "I've been praying so much, baby. It's a shame that it took this to happen to make me propose to you. I hope you tell Chad [Mr. Peveler] that I'm your fiancé. I love you, baby." Defendant sent the following additional text message at 7:41 p.m. on October 29, 2010, while Ms. Peveler was at the hospital: "Baby, how's she doing? Pls . . . answer me, sweetheart [??!!!]" Defendant sent the following messages to Ms. Peveler on October 30, 2010:

> 6:38 p.m. – "Hey,babe, you still busy? I hope you're still coming over."
> 6:43 p.m. – "Can you call me p-l-s?"
> 6:47 p.m. – "Why are you acting like this? Just because you are with Chad?"
> 8:34 p.m. – "You going [to] call me back, babe?"
> 8:34 p.m. – "I miss you[.]"

Detective Bailey testified that he interviewed Defendant at 4:00 a.m. on October 30, 2010, and he later obtained Defendant's cell phone records. He noted that Ms. Peveler was interviewed at 5:50 p.m. on October 30, 2010. Ms. Peveler told Detective Bailey that she was at the hospital when she received Defendant's first text message on October 29, 2010. She also communicated with Defendant during breaks while she was being interviewed by police on October 30, 2010. Detective Bailey thought Ms. Peveler's interview process took four to six hours.

Detective Bailey testified that Ms. Peveler's cell phone records, based on cell phone tower information, corroborated her story that on October 29, 2010, she drove to

the area of Defendant's house, then left Defendant's house and drove to the area of Walmart, and went back to the area of Defendant's apartment and then to the area of Hendersonville Hospital. Detective Bailey testified in detail concerning calls made from Ms. Peveler's cell phone on October 29 and which cell phone tower or sector the calls were made from.

On November 1, 2010, Detective Bailey and Detective Bachman drove to Defendant's apartment. They spoke to Defendant and asked him to accompany them to the Hendersonville Police Department to give a detailed interview, and Defendant agreed to do so. Detective Bailey testified that Defendant's initial statement was identical to what Ms. Peveler first told them. During the interview, Defendant changed some of his story. Detective Bailey noted that, when Defendant was left alone at one point during the interview, he read one of the investigator's notes.

Dr. Amy Fleming, a pediatrician employed with Vanderbilt University, is an expert in pediatrics and child abuse. On October 30, 2010, she was the physician on call for the Child Abuse Response and Evaluation Team (CARE) and was asked to come to the intensive care unit at Vanderbilt to evaluate the victim. Dr. Fleming had reviewed all of the records relating to the victim, and she was familiar with the course of treatment that was provided to her by Vanderbilt.

Dr. Fleming testified that, when the victim arrived at Vanderbilt Children's Hospital, she was in cardiac and respiratory failure. Dr. Fleming said:

> [The victim] was then immediately taken up to the intensive care unit at Vanderbilt. And there they continued to try and support her by breathing for her with a ventilator, by giving her fluids, by giving her medicine to try to decrease the pressure in her brain because they knew that she was having swelling in her brain. And they actually put in a monitor into her brain to try and measure how high that pressure was. The neurosurgeons and the pediatric surgeons evaluated her.

Dr. Fleming testified that the neurosurgeons reviewed all of the scans which revealed that the victim had subdural hematoma, or a blood clot, on the outside of her brain as a result of trauma. They also determined that there were no surgical options to remove the clot. Dr. Fleming noted that the victim's brain was extremely swollen. At that point, Dr. Fleming evaluated the victim, who was intubated. The victim already had one examination for "brain death" that day, and she had been declared "brain dead at that

- 12 -

point." The victim also had a "cerebral profusion study" to look at the "blood flow to the vortex of the brain, and that was positive for brain death as well." Dr. Fleming testified that the victim had a second examination for brain death the following morning and the victim was again declared brain dead. Her organs were later harvested for donation on November 1, 2010. It was Dr. Fleming's opinion that the victim suffered "abusive head trauma." She specifically testified that a fall from a couch would not have caused the head injury. Dr. Fleming testified that the "most likely mechanism for all of these things is some combination of shaking and impact of her head against a hard surface."

Dr. Fleming testified that she spoke with the victim's parents, Chad and Amber Peveler, as part of her evaluation. She said that Ms. Peveler gave the following statement:

> And [Ms. Peveler] stated that [the victim] had been acting completely normally [sic] on the morning of the trauma and that she had been playing with her older sister.

> At some point they went over to [Defendant's] home, who is a friend of [Ms. Peveler], [the victim's] mom. And Mom said that she was trying to put her to sleep and she was laying—she had [the victim] laying on her chest and was trying to put her to sleep, and she went to put her down in the back bedroom.

> And then about 20 minutes later, she went back to get her, and [the victim] wouldn't wake up at this point. She said she was limp and not responding to her. And so her friend, [Defendant], had tried to get a pulse and couldn't find it and tried to do CPR and that didn't work and tried to splash water on her face and that didn't work.

> So they got into their truck and drove to the emergency room right away at that point.

Dr. Fleming noted that the victim had bruising on her face, buttocks, and around her vaginal area. "She had bruising on her chest and on her inner thigh and a bruise on her knee."

Concerning the findings from the victim's ophthalmologic exams, Dr. Fleming testified:

> One of the concerning findings from her ophthalmologic exams, or her eye exam, was obtained by looking through the pupil at the inside of the eyeball. So the eyeball is actually a globe and it has fluid inside it and you can see all the way through using special lenses to the back, which is called the retina. And she had retinal hemorrhages, which are seen on both sides. These are related to her abusive head trauma.
>
> We also had something called retinoschisis, which means that actually part of the retina was torn off the back of the inside of the eye, and that is almost never seen in anything other than abusive head trauma.

When asked about the time frame of the victim's injuries, Dr. Fleming further testified:

> It's very difficult to give a specific time, but the child would not have been acting normally after this happened. So the fact that mother told me that she was acting normally the morning of [sic] means to me that this happened after that point in time.
>
> There can be a wide range of symptoms that happen after this from fussiness to going directly into coma, but she's not going to have progression like this that's so rapid when she comes to the hospital without it having been progressing before.
>
> I would expect that this happened within the day, probably within 12 to 18 hours at the most prior to the time that she showed up in the hospital.

Dr. Fleming testified that the victim's injury was a "violent inflicted injury" most likely related to shaking. She said:

> The shaking causes the brain to move back and forth and rips tiny little veins that sit between the brain and move out from the brain. That's how you get the subdural hemorrhage.

- 14 -

The shaking causes the shearing forces, so rubbing the two things next to each other, which caused the retinal hemorrhages in the eyes, and then the fact that she has this swelling on the outside of her skull on more than one side. Actually, based on the medical examiner's evaluation, she had more than one impact to her head against a hard surface.

Dr. Fleming testified that she had seen injuries similar to the victim's from a horrific car accident or a fall from a second or third story building.

Dr. Bridget Eutenier, an associate medical examiner at Forensic Medical, the Office of the Medical Examiner in Nashville, performed an autopsy on the victim. She determined that the cause of death was blunt force injuries to the victim's head, and the manner of death was homicide. Dr. Eutenier also defined the circumstances of death as "[a]ssaulted by other(s)." She noted that the victim was declared legally dead at 12:41 a.m. on October 31, 2010. The victim's bodily functions were continued until after 4:00 a.m. on November 1, 2010, at which time the baby's organs were harvested for donation.

Dr. Eutenier described her external observations of the victim's head as follows:

There were two faint blue contusions on the posterior aspect of the left side of the head and they measured one-half and five-eighth's inch.

There was a one and one quarter by one inch slight blue contusion on the right side of the head. There was a faint three-quarter inch area of brown discoloration on the left side of the jaw. And a one-and-one half inch faint brown area of discoloration on the right side of the jaw.

Dr. Eutenier further testified that the contusions on the victim were indicative of "some force applied, some impact, of this child's head." A third contusion was discovered on the posterior of the victim's head.

Dr. Eutenier found a seven-centimeter hemorrhage on the inside of the victim's scalp on the right posterior side of her head. There was a second seven-centimeter hemorrhage in the middle of the victim's head and a third hemorrhage measuring ten-and-a-half centimeters by nine centimeters closer to the front left side of her head. In addition to the damage to the victim's brain, Dr. Eutenier found a "diffuse subdural hemorrhage of the spinal cord." She also found "bilateral optic nerve sheath

- 15 -

hemorrhages, retinal hemorrhages of the left eye, and possible retinal hemorrhages of the right eye[.]" There were also blunt force injuries to the victim's torso. Dr. Eutenier testified: "The bruises that she had on her torso did not cause her death, but they are an indication of trauma occurring." Concerning bruising to the victim's neck, Dr. Eutenier testified:

> Well, by the time I did the autopsy, it was just an area of discoloration so I could not definitively conclude based on the autopsy that it was a bruise. But after reviewing medical records and photographs from the hospital, there were bruises on the jaw, and they may or may not have occurred at the same time that the injuries—the other injuries of the head occurred.

Dr. Eutenier testified that there was an abrasion of the left upper quadrant of the victim's torso and three bruises on her buttocks. She did not find any evidence of old injuries that would have occurred before August 2010. Dr. Eutenier explained that the blunt force trauma to the victim's head did not fracture the victim's skull because:

> Children have a very thin, pliable skull so they don't—it's not as thick and calcified as an adult skull so it absorbs force a little differently than adult skulls do so you can have blunt force injuries without skull fracture.

Dr. Eutenier estimated that the injuries that caused the victim's death were inflicted two to three days prior to her metabolic death, when her organs were collected. Therefore, the injuries would have been inflicted on October 29 or 30, 2010. She also testified the victim's injuries were consistent with a fall from a third floor window, and she testified that the victim would not have acted normally after sustaining the injuries. Dr. Eutenier could not rule out that there "were not acceleration-deceleration injuries in addition to the blunt force injuries that caused [the victim's] death."

Marlon Thompson testified that he knew Ms. Peveler through his ex-girlfriend, Terika Perry. He admitted that he had sold drugs in the past and he had a felony drug conviction in 2001. He also had convictions for driving on a suspended license, trespassing, and criminal impersonation. Mr. Thompson testified that he had also violated the terms of a previous probation.

- 16 -

Mr. Thompson testified that he was selling Dilaudid pills to Ms. Peveler in October 2010. He thought that he met her three or four times at the Home Depot in the Rivergate area and in Hendersonville. Mr. Thompson recalled meeting with Ms. Peveler on October 29, 2010. She had called him earlier in the day to set up the buy, but he could not meet her until approximately 4:30 or 5:00 that afternoon because he had to take his girlfriend to work at the Walmart in Hendersonville.

Mr. Thompson testified that he met Ms. Peveler in the Walmart parking lot and walked up to her truck. He saw Ms. Peveler's older daughter in the back seat, but the victim was not in the truck with her. Mr. Thompson noted that he had previously asked Ms. Peveler not to bring the children with her to buy pills. He said that Ms. Peveler ultimately purchased eight Dilaudid pills but he noted that she was four dollars short. Mr. Thompson testified that Defendant called him on October 30 or 31, 2010, and asked to buy some pills but Mr. Thompson refused to sell him any. Mr. Thompson gave a statement to Detective Bachman and another officer a few days later.

Rebecca Wyatt testified that she previously worked with Ms. Peveler at the Hendersonville Walmart and they were friends. On October 30, 2010, Ms. Wyatt received a call from Ms. Peveler who asked if Ms. Wyatt would "vouch" for her and say that Ms. Peveler came to meet her at the Hendersonville Walmart to get twenty dollars for gas money. Ms. Wyatt testified that she had seen Ms. Peveler interact with the victim and L.P. and Ms. Peveler was "a great mom. She was very good with them."

Philip Miceli, Defendant's cousin, testified that he and Defendant frequently "hung out" and used drugs together in 2010. He was at Defendant's apartment on occasions when Ms. Peveler was there with the victim and L.P. Mr. Miceli testified that he sometimes held the victim while she was at the apartment. He noted that one time while he was holding the victim, Ms. Peveler went outside to her vehicle and left the victim alone with him and Defendant. Mr. Miceli testified that Ms. Peveler gave Defendant money, which was sometimes sixty to one hundred dollars per day.

Michael Needel, Ms. Peveler's father, testified that Ms. Peveler, the victim, and L.P. lived with him and his wife, Deborah Needel, until October 29, 2010. He noted that Ms. Peveler was a good mother who was very patient with the victim and L.P. He never saw Ms. Peveler spank the children. Mr. Needel testified that he had never noticed any unexplained injuries or bruises on the victim prior to October 2010. He also had never seen Ms. Peveler act angrily toward the victim or lay a hand on the child.

- 17 -

Mr. Needel testified that Ms. Peveler was arrested for theft in October 2010 and lost her job at Walmart. She also got behind on her car payment and insurance. Mr. Needel testified that he went on a business trip to Colorado during the week that the victim's injuries occurred. He returned from the trip on Friday, October 29, 2010. Mr. Needel testified: "I think it was about the week or so before I went to Colorado is when we noticed that there were bruises underneath [the victim's] chin." At that point, there was a discussion with Mrs. Needel about the origin of the bruises. Mr. Needel suspected that Mrs. Needel's mother, "Granny Rose," might have caused them. He had previously seen "Granny Rose" grab one of the children that she cared for. He testified:

> You know, I don't know if they were—I'm not sure if it was [L.P.] or one of the other kids, because she watches five or six different kids. I just want to clarify that. But she grabbed them—I guess they had said something smart, and she had grabbed them that way.

> So when we saw the bruises on [the victim], I just said, you know, "Hey, I've seen your mom do something very similar."

Mr. Needel testified that he received a call on Thursday, October 28, 2010, from Mrs. Needel indicating that there were some bruises on the victim's bottom. He and Mrs. Needel decided to discuss the matter further when he got back into town the following day. Mr. Needel testified that he never got a chance to conduct a family meeting over the bruises. During a layover in Dallas, Texas on Friday, October 29, 2010, Mr. Needel received a call from his sister-in-law who informed him that the victim was being taken to the hospital and that "it was pretty serious." When Mr. Needel arrived in Nashville, a friend drove him to Vanderbilt Children's Hospital. While he was at the hospital, Mr. Needel saw Ms. Peveler talking on her cell phone to someone. He assumed it was Defendant.

Deborah Needel, Ms. Peveler's mother, testified that the victim and L.P. were primarily cared for by herself, Ms. Peveler, and Mrs. Needel's mother. She said that in October 2010, Ms. Peveler went to Defendant's apartment on a regular basis. Mrs. Needel noticed bruises on the victim's face around the time of Ms. Peveler's birthday on October 21, 2010. Mrs. Needel discussed the matter with her husband who suggested that Mrs. Needel's mother caused the bruises on the victim.

Mrs. Needel testified that she saw Ms. Peveler, the victim, and L.P. on Wednesday, October 27, 2010, when she met them at Pizza Hut for dinner. Mrs. Needel

- 18 -

then went to church, and sometime after she got home, the victim fell off the couch at the Needel's home. Mrs. Needel did not notice any injuries from the fall. Mrs. Needel testified that she met Ms. Peveler, the victim, and L.P. again for dinner at Captain D's on Thursday, October 28, 2010. While they were at the restaurant, the victim vomited. After they all arrived home from Captain D's, Mrs. Needel helped Ms. Peveler give the victim and L.P. a bath. The victim seemed fine in the bathtub, but Mrs. Needel discovered bruises on the victim's bottom when she took the victim out of the tub. Ms. Peveler seemed surprised and said that she had no idea where the bruises came from. Mrs. Needel later told her husband about the bruises, and he suggested that they would discuss the matter when he arrived home on Friday, October 29, 2010.

On Friday, October 29, 2010, Mrs. Needel was at a church retreat when a friend arrived and informed her that the victim had been injured. Mrs. Needel then went to Vanderbilt Children's Hospital with Ms. Peveler and L.P. She testified that Ms. Peveler was hysterical when she was later informed of the seriousness of the victim's injuries and that the victim was "probably not going to make it." Mrs. Needel recalled that the term "shaken baby [syndrome]" was mentioned. Mrs. Needel testified that Ms. Peveler never "laid a hand on those girls" and that she only spoke to them when disciplining them, or she placed them in time-out. Mrs. Needel had never noticed any unexplained bruises on L.P. She also had never noticed unexplained bruises on the victim until Ms. Peveler began spending more time with Defendant.

The parties agreed to the following stipulation as to the testimony of Ashley Gillespie:

> [Defendant] and Ashley Gillespie were dating in October of 2010. [Defendant's] nickname for Ashley Gillespie is Smash. Ashley Gillespie observed [Defendant] use drugs. When [Defendant] used drugs—used, he would snort or inject the pills.

> [Defendant] told Ashley Gillespie that Amber Peveler was his roommate, Conrad's, friend's wife. [Defendant] told Ashley Gillespie that Amber Peveler was providing him with drugs and a lot of money.

> [Defendant] and Ashley Gillespie had plans to meet the evening of October 29, 2010. [Defendant] left Ashley Gillespie a voice mail at 4:24 p.m. that will be introduced into evidence. Ashley Gillespie was already on her way to [Defendant's] apartment in Hendersonville when [Defendant]

- 19 -

called her to come get him at Hendersonville Hospital. When Ashley Gillespie arrived at the hospital, she briefly saw [Defendant] and Amber Peveler outside the hospital, but never spoke with Amber Peveler.

After [Defendant] and Ashley Gillespie left Hendersonville Hospital, they returned to [Defendant's] apartment, got Chinese food and rented movies. Ashley Gillespie was the woman in [Defendant's] apartment when Sergeant Coarsey of the Hendersonville Police Department interviewed [Defendant] around 4 a.m. on October 30, 2010.

Chad Peveler, the victim's father and Amber Peveler's husband, testified that he and Ms. Peveler had separated in June of 2010 because of his addiction to narcotics after having knee surgery. Mr. Peveler was living with his parents in Smyrna when he received a call that the victim was injured. He arrived at the hospital, and he and Ms. Peveler met with doctors who told them that the victim's condition was grave. The victim was later declared brain dead, and her organs were donated. Mr. Peveler testified that at the time he had not seen the victim or L.P. since August 2010.

Detective Jim Bachman of the Hendersonville Police Department was contacted by Maria Lubrano, a Department of Children's Services caseworker, at approximately 10:00 to 11:00 p.m. on October 29, 2010, about a possible child abuse case referred from Vanderbilt Children's Hospital. Detective Bachman met Ms. Lubrano at the hospital, and they spoke to doctors. He also interviewed Ms. Peveler. Detective Bachman testified:

When I spoke to Amber [Peveler] of course, it's the first time I met her, she came in to meet with me and Ms. Lubrano even though her child was in the hospital. I got the basic information from her as far as her name and address, that sort of thing. And started asking her what happened, who was around the child recently, that sort of thing, caretakers. And she mentioned that she came from [Defendant's] apartment to the Hendersonville Hospital and that's how they got to Vanderbilt.

During that conversation, she began telling me that [Defendant] had never been left alone with the children, didn't bathe the children, didn't change their diapers, that sort of thing. Those sort of things were unsolicited from me.

- 20 -

Detective Bachman noted that Ms. Peveler's story seemed to be a "little recited," and he did not feel that she was being truthful. She told him that they never left Defendant's apartment before the injury, and she also told him about the victim's fall from a couch on Wednesday, October 27, 2010.

Detective Bachman testified that Ms. Peveler was interviewed at the police department the following day, October 30, 2010, and he watched the interview from a monitor in another room. Ms. Peveler initially told the same story that she had told Detective Bachman earlier. However, she later said that she left Defendant's apartment to get some money from Rebecca Wyatt. Detective Bachman testified that Ms. Peveler eventually gave the following account of the events prior to the victim's injuries:

> That account was that she was contacted by [Defendant] when she was at her home in Gallatin to come to his apartment. So she did with the girls. The account was that she got some money from [Defendant]. [The victim] was left there with [Defendant]. She drove her other daughter, [L.P.], to Wal[]mart Hendersonville, met Marlon Thompson in the parking lot of Wal[]mart, bought the pills, and then drove back to [Defendant's] apartment.

Detective Bachman testified that he interviewed Defendant on November 1, 2010. He said:

> [Defendant's] account was that Amber [Peveler] and the girls came over to his apartment on the 29th of October and that they had not left the apartment until they left to go to the hospital, that Amber had never left until they left to go to the hospital with [the victim].

> .    .    .

> He said that when Amber discovered [the victim] unresponsive, they had planned on going to get some pizza.

Detective Bachman testified that Defendant's story was very similar to Ms. Peveler's initial account of what happened. He noted that Defendant was unemployed, did not have his own "place," and he had "personal family issues with a divorce and

- 21 -

children, that sort of thing." Defendant did not like living at the apartment with his roommate because it was not clean. Defendant was also seeing different women.

Detective Bachman testified that Defendant eventually told him that Ms. Peveler left the apartment to buy pills for him in Madison. Defendant also gave a written statement:

> Amber [Peveler] and the kids got here sometime in the afternoon. We decided we wanted to get a pizza or something to eat. She went to get the baby from sleeping and the baby was limp. We got the kids in the truck and I rushed us to the hospital. Sometime this week Amber had said that [the victim] had fallen off the bed and had a knot on the back of her head.

Detective Bachman admitted that Defendant also gave a written statement during the early morning hours of October 30, 2010, but it could not be located. Detective Bachman testified at trial concerning the victim's cell phone records. He testified that Ms. Peveler and Defendant were in contact with each other while Detective Bachman was interviewing Mr. Peveler on October 30, 2010.

Detective Bachman next interviewed Defendant on the ride back to Tennessee from Mississippi after Defendant's arrest. Defendant did not admit to killing the victim or watching her at his apartment. He admitted that he did not respect women at the time and that he had a drug problem. Defendant told Detective Bachman and Lieutenant Scott that Ms. Peveler left his apartment on October 29, 2010, to buy some pills for him. Detective Bachman noted that the original story told by Defendant and Ms. Peveler protected Defendant.

On cross-examination, Detective Bachman agreed that the medical records indicated that the victim was subjected to some abuse prior to October 29, 2010. He was led to believe that Ms. Peveler's grandmother inflicted the bruises to the victim's neck. However, after interviewing the grandmother, there was no evidence to support the accusation.

## Analysis

Defendant raises four issues on appeal. We will address them out of order because Defendant's first and fourth numbered issues are somewhat intertwined.

- 22 -

# The Rule of Sequestration

## *Defendant's Motion to Exclude Detective Bachman*

Prior to voir dire, trial counsel asked for "the rule." The trial court instructed the witnesses that they would have to remain outside until called to testify. The State identified two possible rebuttal witnesses, and at the request of Defendant, they were also excluded from the courtroom. Detective Bachman's presence in the courtroom was not discussed. At approximately 8:15 on the morning of the fourth day of trial, Defendant made an oral motion to exclude the "State's representative," Detective Bachman, from testifying and presented the court with a copy of Mothershed v. State, 578 S.W.2d 96 (Tenn. Crim. App. 1978). The State asked for time to respond, and the trial court stated it would rule on the motion at 9:00 a.m. before bringing the jury into the courtroom. When the court reconvened, the State announced initially that they thought Defendant was correct. The trial court stated it had done its own research and concluded the State had the right to have "the lead prosecutor in the courtroom unless there is prejudice." During the argument, counsel for the State continued to research and ultimately cited State v. Bobby Gene Keck, No. 01C01-9401-CC-00017, 1997 WL 254228, at *9 (Tenn. Crim. App. May 16, 1997), perm. app. denied (Tenn. Crim. App. Mar. 2, 1998). Defendant stated that before Detective Bachman testified, he would like to examine him outside of the presence of the jury. Because the jury was waiting, the hearing was continued until the lunch break. After lunch, the trial court pointed out that Rule 615 was enacted after Mothershed and denied Defendant's motion. Rather than call Detective Bachman to the stand, counsel for Defendant asked the trial court to allow him to make a statement on the record as an officer of the court specifying how Defendant was prejudiced by Detective Bachman having been present in the courtroom. The request was granted. Generally, trial counsel argued that Detective Bachman listened to the other witnesses and observed cross-examination so as to be aware of the defense's strategy.

Defendant argues that the trial court committed reversible error by allowing Detective Bachman to testify as the last witness for the State in violation of Rule 615 of the Tennessee Rules of Evidence. The State, citing in its brief only Smartt v. State, 112 Tenn. 539, 80 S.W. 586 (1904) and Mothershed, conceded error but asserted the error was harmless. We disagree with Defendant, and we are not bound by the State's concession. See Barron v. State Dep't of Human Servs., 184 S.W.3d 219, 223 (Tenn. 2006); State v. Mitchell, 137 S.W.3d 630, 639-40 (Tenn. Crim. App. 2003). There was no violation of sequestration because the State had the right under Tennessee Rule of

- 23 -

Evidence 615 to designate Detective Bachman, as an investigating officer, exempt from sequestration. As such, Detective Bachman was allowed to remain in the courtroom during the testimony of other witnesses, unless there was a compelling reason for the trial court, in the exercise of its sound discretion, to exclude him. Tenn. R. Evid. 615; Jordan, 325 S.W.3d at 40. Because there still appears to be confusion about the applicability of the exclusion of the State's designated representative under Mothershed, we will explain how we reached this conclusion.

*Sequestering the Prosecuting Witness*

The practice in Tennessee of excluding the prosecutor from the courtroom until the prosecutor testifies originated in Smartt. At the time Smartt was decided, Tennessee Code Annotated section 40-2403 required a defendant to testify before any other defense witness testified. See Brooks v. State, 406 U.S. 605, 608 (1972); Clemons v. State, 92 Tenn. 282, 21 S.W. 525, 525 (1893). Our supreme court in Smartt stated:

> The attorney for the state has the right to such assistance as the prosecutor can give him in the management of the state's case, and, upon his request, it is not error to permit the prosecutor to remain in the courtroom after the rule has been called for; but the court should impose as a condition that the state, if it desires to use the prosecutor as a witness, should examine him first.

Smartt, 80 S.W. at 588. Our court has characterized the ruling in Smartt as creating "symmetry by preventing either party from having the advantage of a witness being able to conform his testimony with that of other witnesses." State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588, at *17-18 (Tenn. Crim. App. May 19, 2004).

In 1972, the United States Supreme Court struck down Tennessee's statute which required a defendant to testify first, holding that "Defendant was deprived of his constitutional rights when the trial court excluded him from the stand for failing to testify first." Brooks, 406 U.S. at 613. Brooks, in effect, ended the "symmetry" created by Smartt that had existed for sixty-eight years. Timmy Reagan, 2004 WL 1114588, at *17-18.

In 1978, our court again addressed the sequestration of the prosecuting witness listed on the indictment. Despite the fact that in 1978 a defendant no longer had to testify

- 24 -

first, the <u>Mothershed</u> court chose to reinforce the seventy-four-year-old <u>Smartt</u> decision, stating:

> However, the opinion in <u>Smartt</u> also notes that "the court should impose as a condition that the state, if it desires to use the prosecutor as a witness, should examine him first." <u>Id.</u> [<u>Smartt v. State</u>, 112 Tenn. 539, 551, 80 S.W. 586, 588 (1904).] We think the rule in <u>Smartt</u> is a reasonable limitation on the provision of T.C.A. [§] 24-106 which *purportedly* exempts parties from the operation of a sequestration order.

<u>Mothershed</u>, 578 S.W.2d at 100 (emphasis added). Although our court found a "technical error" on the part of the trial court in failing to sequester the prosecuting witness during a jury-out suppression hearing, it concluded that no substantial injury was done to the defense." <u>Id.</u>

Following <u>Smartt</u>, Tennessee Code Annotated section 24-106 was renumbered and became section 24-1-204, which provided: "Nothing in any section shall be construed to require the parties, or either of them, to be put under the rule, when witnesses in any cause in which the rule has been applied for and granted." Section 24-1-204 was subsequently repealed by 1991 Pub. Acts, c. 273 with the adoption of the Tennessee Rules of Evidence and replaced by Tennessee Rule of Evidence Rule 615, which took effect on January 1, 1991. <u>See</u> <u>State v. Stephens</u>, 264 S.W.3d 719, 738 (Tenn. Crim. App. 2007).

*Tennessee Rule of Evidence 615*

Since 1991, sequestration of witnesses has been governed by Tennessee Rules of Evidence Rule 615, which originally provided:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. Sequestration shall be effective before voir dire or opening statements if requested. The court shall order all persons not to disclose by any means to excluded witnesses any live testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or *(2) an officer or employee of a party which is not a natural person designated as its representative by its attorney,* or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Tenn. R. Evid. 615 (emphasis added).

- 25 -

We have found only one case dealing with sequestration of the designated representative issued after Rule 615 became effective and before the Rule was amended in 1997. In State v. Wingard, defense counsel asked for the rule to be applied to the prosecutor when the first witness was called to testify by the State. The trial court allowed the prosecutor to remain in the courtroom as an "essential" person under Rule 615 subsection three (3). Our court stated:

> We do not agree with the state's reliance upon subsection three (3). Pursuant to subsection two (2), however, the state is permitted to designate a representative. See N. Cohen, D. Paine, S. Sheppeard, Tennessee Law of Evidence, § 615.2 (2nd ed. 1990). When applying the similar federal rule of evidence, courts have previously held that such designations may include investigating officers who will be testifying. See, e.g., United States v. Martin, 920 F.2d 393, 397 (6th Cir.1990). In our view, Warden Smith, as the chief official at the correctional facility and a participant in the search for Defendant, would qualify as the state's designated representative or "prosecutor" in this case.

State v. Wingard, 891 S.W.2d 628, 635 (Tenn. Crim. App. 1994). Although Wingard does not specifically address what affect, if any, Rule 615 had on Mothershed, the case implicitly stands for the proposition that the state's designated representative can remain in the courtroom during the testimony of other witnesses without being required to testify first, because that is precisely what had occurred in the case.

In 1997, Rule 615 was amended. Rule 615 now provides:

> At the request of a party, the Court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the Court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The Court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) *a person designated by counsel for a party that is not a natural person*, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615 (emphasis added).

The Advisory Commission Comments [1997] state the following concerning the changes to Rule 615 as a result of the 1997 amendment:

> The second change modifies the second category of persons not sequestered. A "party that is not a natural person" includes, among other entities, a corporation and the State of Tennessee. Consequently, the prosecuting attorney could designate a crime victim, a relative of a crime victim, *or an investigative officer*. Like category (1), *category (2) is a matter of right*. Category (3), in contrast, is a matter of judicial discretion."

(Emphasis added).

Following the effective date of the 1997 amendments to Rule 615, this court for the first time addressed sequestration of the State's designated representative in Bobby Gene Keck, a per curiam opinion in which this court stated:

> In the present case, Agent Taylor was assigned the responsibility of investigating alleged criminal conduct at the Highway Department. He was clearly the representative or prosecutor for the state. *As such, under subsection (2), it was not a violation of Rule 615 to allow Agent Taylor to sit at the State's table during the testimony of the first five witnesses before being called to testify*. This issue is without merit.

Bobby Gene Keck, 1997 WL 254228, at *9 (emphasis added).

In State v. Elkins, 83 S.W.3d 706 (Tenn. 2002), the appellant claimed, among other things, that the trial court erred by not sequestering the victim. Ultimately, our supreme court concluded that the trial court committed reversible error in failing to instruct on a lesser included offense. Elkins, 83 S.W.3d at 712. However, concerning sequestration, Justice Drowota, writing for the unanimous court, stated:

> Having so concluded, we need not address Defendant's assertion that the trial court erred in allowing the victim to testify at the sentencing hearing even though she had remained in the courtroom after the defense invoked the rule of sequestration, Tenn. R. Evid. 615. Nonetheless, we note that

- 27 -

Rule 615 does not mandate exclusion of all persons and permits counsel for a party that is not a natural person to designate a person to remain in the courtroom. The 1997 Advisory Commission Comments to Rule 615 specifically explain that this provision permits the prosecuting attorney for the State of Tennessee to designate a crime victim as the person to remain in the courtroom despite invocation of the rule of sequestration. Therefore, on remand if the prosecution so desires, it may designate [the victim] as a person to remain in the courtroom even if the defense again invokes Rule 615.

Id. at 713 (footnote added). Although the opinion does not cite Mothershed or Smartt, the dicta in Elkins implies that Rule 615 supersedes the Mothershed rule requiring the State's designated representative, albeit in Elkins the victim, to testify first or be sequestered.

In 2004, for the first time since Rule 615 became effective, our court returned to the Smartt rule requiring the prosecutor to be sequestered or to testify first, stating:

We do not *believe* that Rule 615 affects Smartt's requirement that the state's designated person testify first. We note, though, that Smartt was decided when a testifying defendant was statutorily required to be the first witness for the defense. See Clemons v. State, 92 Tenn. 282, 284, 21 S.W. 525 (1893). The rule in Smartt created a symmetry by preventing either party from having the advantage of a witness being able to conform his testimony with that of other witnesses. See Brooks v. State, 406 U.S. 605, 611, 92 S. Ct. 1891, 1894 (1972). That symmetry was ended in Brooks when the United States Supreme Court held that making Defendant testify first or not at all violated Defendant's right against self-incrimination and right to due process. Id. 406 U.S. at 611 n. 5, 92 S. Ct. at 1894-95.

Although Defendant no longer need testify first, we believe the Smartt rule generally remains in effect as shown in Mothershed. We say generally, however, because an expert witness is usually allowed to hear the testimony of other witnesses in order to formulate an opinion or respond to the opinions of other expert witnesses. See State v. Bane, 57 S.W.3d 411, 423 (Tenn. 2001); Tenn. R. Evid 703. In Bane, our supreme court stated that "allowing an expert witness to remain in the courtroom as an 'essential person' generally does not create the risk that the expert will alter or change factual testimony based on what is heard in the courtroom." Id. This

- 28 -

> necessarily entails the expert testifying after other witnesses. We are
> mindful that Agent Campbell essentially gave expert testimony.

Timmy Reagan, 2004 WL 1114588, at *17-18 (emphasis added). Bane, which involved the "essential" person exclusion under Rule 615 subsection three (3), was the only post-Rule 615 case cited in Timmy Reagan. It is important to note that the exclusion provided by Rule 615 subsection three (3) differs fundamentally in its manner of application from the exclusion provided in subsections one (1) and two (2). As previously stated, the exception to witness exclusion in subsection three (3) "is a matter of judicial discretion," whereas the exception in subsections one (1) and two (2) is a "matter of right." Tenn. R. Evid. 615 Advisory Comm'n Comments [1997]; see Stephens, 264 S.W.3d at 738; State v. Reginald Fowler, No. E2009-00293-CCA-R3-CD, 2010 WL 3774413, at *18 (Tenn. Crim. App. Sept. 29, 2010).

Following Timmy Reagan, our court issued State v. Timothy Wright, in which the court stated:

> The Court of Criminal Appeals has said, "We do not believe that Rule 615 affects Smartt's requirement that the state's designated person testify first." State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, slip op. at 18 (Tenn. Crim. App., Nashville, May 19, 2004). That said, the Timmy Reagan Court recognized an exception in the case of expert witnesses, see id., slip op. at 18; State v. Bane, 57 S.W.3d 411, 423 (Tenn. 2001), and more significantly, that court applied the rule that the party aggrieved by the designated witness's deferred testimony must show prejudice via the designated witness "improperly chang[ing] his [or her] testimony while hearing other witnesses testify," Timmy Reagan, slip op. at 18; see Mothershed v. State, 578 S.W.2d 96, 100-01 (Tenn. Crim. App. 1978).

State v. Timothy Wright, No. W2005-00525-CCA-R3-CD, 2005 WL 3533343, at *3 (Tenn. Crim. App. Dec. 27, 2005).

Next, in State v. Stephens, 264 S.W.3d 719 (Tenn. Crim. App. 2007), our court again affirmatively quoted the Timmy Reagan language "we believe the Smartt rule generally remains in effect as shown in Mothershed." Stephens, 264 S.W.3d at 739. As was the case in Timmy Reagan and Timothy Wright, Stephens did not cite Wingard,

Bobby Gene Keck, or Elkins.  Timmy Reagan was the only post-Rule 615 sequestration case cited by our court in Stephens.[1]

In State v. Jordan, our supreme court addressed the trial court's refusal to allow testimony of Defendant's parents during the sentencing phase of a first degree murder case because they had violated the rule of sequestration by remaining in the courtroom during the guilt/innocence phase of the trial.  Defendant's pretrial motions to exempt Defendant's family from sequestration had been denied.  In analyzing Rule 615, Justice Clark, writing for a unanimous court, stated:

> Our current Rule 615 sets forth several specific exceptions to its application.  First, *parties who are natural persons may not be excluded from the courtroom while witnesses are testifying.*  Second, if *a party is not a natural person* but is, for instance, a corporation, *the party's counsel may designate a natural person who may not be sequestered.*  Or, *if the State is a party, the prosecuting attorney may designate* a crime victim, a crime victim's relative, or *an investigating officer as immune from sequestration.*  Tenn. R. Evid. 615 advisory comm'n cmts. to 1997 amend.
>
> .        .        .
>
> These exceptions to the general rule of sequestration illustrate the tensions between the underlying purpose of the rule and other, equally significant concerns.  *Thus, a party to the litigation will not be prevented from hearing testimony, even if he or she plans to testify and even though a party has the most incentive to tailor his or her testimony.*  Also, a witness who is expected to offer expert opinion testimony about facts testified to, as opposed to testimony about the facts themselves, is acknowledged to be outside the scope of the rule.  Both exceptions make clear that the rule does not establish a concrete line which may never be crossed.  Rather, as with other rules of evidence, there is latitude within which a trial court is expected to exercise its discretion.  That discretion should be exercised with the aim of protecting the goals of the rule and should take into account the risk that the witness for which an exception is sought "will alter or change

---

[1] We note, that in all of the sequestration cases cited above in which the appellate court found the trial court erred in either sequestering or not sequestering a witness, the appellate court found the error did not amount to reversible error.

- 30 -

factual testimony based on what is heard in the courtroom." [Bane, 57 S.W. 3d at 423].

State v. Jordan, 325 S.W.3d 1, 40 (Tenn. 2010) (emphasis added) (additional citations omitted). The only reasonable reading of Jordan is that if a person is immune from sequestration under Rule 615 subsection (1) or (2), then that person may remain in the courtroom during the testimony of other witnesses, unless in the exercise of its discretion, the trial court determines that the witness should be excluded to protect the goals of the Rule 615.

Seven days after Jordan was issued, our court in State v. Reginald Fowler turned the "belief" expressed in Timmy Reagan, Timothy Wright, and Stephens—that Rule 615 did not affect the requirement from Smartt that the State's designated representative testify first—into an affirmative obligation that the State's representative testify first, stating:

> A designated representative or prosecuting witness, however, *is required to testify before other witnesses*. See Stephens, 264 S.W.3d at 738-39; State v. Smartt, 112 Tenn. 539, 80 S.W. 586, 588 (Tenn. 1904); Mothershed v. State, 578 S.W.2d 96, 100-01 (Tenn. Crim. App. 1978).

State v. Reginald Fowler, No. E2009-00293-CCA-R3-CD, 2010 WL 3774413, at *18 (Tenn. Crim. App. Sept. 29, 2010) (emphasis added). Reginald Fowler did not mention our court's opinions in Wingard and Bobby Gene Keck or the supreme court's opinions in Elkins and Jordan. Other than Timmy Reagan and Stephens, the only post-Rule 615 case cited on the issue of sequestering a witness, was Bane, which dealt with subsection three (3) of the rule.

Based on Jordan, we conclude that Rule 615, as amended in 1997, supplanted the condition from Mothershed and Smartt that the prosecutor should be required to testify first or be sequestered. Thus, in this case, the trial court did not err in denying Defendant's motion to exclude Detective Bachman. Although Jordan did not mention Timmy Reagan, Timothy Wright, or Stephens, we further conclude that any opinions issued by our court after 1997 stating that Mothershed was not affected by Rule 615 or that the State's designated representative is required to testify before other witnesses were abrogated by Jordan. The trial court, however, has broad discretion to decide if and when a witness immune from sequestration should be sequestered and, if a witness violated the rule of sequestration, the sanctions that should be imposed. Jordan, 325 S.W.3d at 39-44.

- 31 -

**Exclusion of Proffer by Amber Peveler**

Defendant argues that the trial court erred by excluding a proffer made by Amber Peveler during the pendency of the case. He contends that by excluding the proffer, the trial court prevented him from presenting a defense. We disagree.

Defendant argues that the proffer was admissible pursuant to Rule 616 of the Tennessee Rules of Evidence which provides: "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."

Defendant argues that Ms. Peveler was "coached" by her attorney during the proffer, and as a result, she received favorable treatment by the State. As pointed out by the State in its brief, Defendant fails to cite to the record in support of his claim. He further fails to explain how the proffer showed that Ms. Peveler was biased or prejudiced against Defendant. Again, Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on [.]" Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."

In any event, at trial Ms. Peveler testified concerning her relationship with Defendant and the circumstances surrounding the death of the victim. After the jury was excused for a lunch break, trial counsel stated: "I'll just let you know I'm planning on playing the proffer which is about an hour." The following exchange then took place:

> [Prosecutor]: Your Honor, I don't believe it's admissible. If you look at 803.26 [sic], it says it had to be a prior inconsistent statement. I'd like to know what about that statement [trial counsel] thinks is inconsistent.

> THE COURT: Hold on. This is a new law. Go ahead, [trial counsel].

[Trial Counsel]: Judge, A: it goes to coaching; it goes to her appearance; it goes to her demeanor; it goes to how she perceived this. This jury should see how she was coached up and how this whole thing is about credibility. We've got one statement on 10/30, and then we've got January of 2012.

.    .    .

THE COURT: Ladies and gentlemen, we're going to take up some arguments here. Everybody else can be excused.

Okay. It's kind of old law and new law, but looking at the new law, 803.26, an exception to the hearsay rule that allows prior inconsistent statements as substantive evidence as opposed to impeaching evidence, I can't help but notice there that it refers back to 613(b), a statement otherwise admissible under Rule 613(b) if all the following conditions are satisfied. So you go back to 613(b).

[Trial counsel], if she admits to making the statements, then how can we get into the substance of the statements and play the statements under Rule 613?

[Trial Counsel]: Judge, it is for impeachment. I might have misspoke as far as substantive evidence. It is impeachment.

The Court has instructed the jury on how to view the credibility of the witnesses. And under the special jury instruction 42.04(a) the jury ought to have a contrast of how she testified today versus how she gave a proffer a year ago, whether it appeared scripted, whether it appeared coached. That is one of the things that is under part 2 "did the witness have a good memory."

I think on the - - I can't remember exactly the proffer - - I watched it over the weekend - - whether she talked about the phone call. Today she denied about the phone call or didn't have any recollection of it.

THE COURT: She didn't remember.

- 33 -

[Trial Counsel]:    She didn't remember.  We've also got how did she look and act in the testimony.  We've got a contrast of how she looked and acted under that, about how she's looking to be honest.  This is a question of whether the jury could be the fact finder or not.

Then we've got this - - any evidence presented regarding the witness' intelligence, respectability or reputation.  [The prosecutor] asked her, "Did you do it, did you do it, did you do it?"  And now we've got - - this is in contrast to that.  Does the witness have any bias, prejudice or personal interest in how the case is decided?  Yes, she does.  And that statement is admissible under that to show that she does have bias, she does have interest.  She was being charged.

THE COURT:    Well, is the statement that she made at the proffer essentially the same thing that she said today?

[The Prosecutor]:    It's - - in the important - - in the key details as to who had the baby and when, yes.  Where did she go, yes.  As far as - - I mean, it's been a year and a half.  There are going to be some differences.

[Trial Counsel]:    There we go.

[The Prosecutor]:    But they're not - - as far as what the actual statement was that "I came to [Defendant's] apartment, I went to go buy drugs from Marlon, I left [the victim] with [Defendant] and I came back and she was nonresponsive," going to the hospital and everything else is pretty much the same.

It's not a prior inconsistent statement, Your Honor.  Everything that [trial counsel] talked about he can do on cross-examination. That's the proper avenue for doing that.  If she denies it on cross-examination, then he can prove it through extrinsic evidence like we have in the rule.  That's what the rules are for.  It's not a prior inconsistent statement.

THE COURT:      You know, I'm always a little bit leery of attorneys coming in and playing the whole prior statement on the record in front of a jury without an evidentiary basis.

Now, like I stated, [trial counsel], if there is an inconsistent statement and she doesn't admit to it, then it's okay to be played.  If you ask her if she was coached or other things and she denied it or if it's very clear that she does not admit the truth of how the thing came about, then I think under that circumstance it would be permissible, but to come in and blanketly play the whole thing without something to make these rules effective, I don't think I can do that now.  I tell you one thing I can do.  I mean, I can listen to this tape during recess.

The State then informed the trial court that the entire proffer was four to six hours long.  Trial counsel noted that the portion of the tape that Defendant wanted to play was approximately one hour and ten minutes.  When asked what Defendant wanted to bring out in the proffer, trial counsel responded:

Judge, it's not what I can bring out.  It's what - - you know, show and tell beats tell.  When you look at that videotape or anybody looks at that videotape, it's obvious that the whole thing was well planned and that is the crux of the case.

.   .   .

Well, it was suggestive.  I think that it was - - Mr. Warlick's a fine attorney.  He's representing his client.  I think it was done in such a way to present his client in the most favorable light possible to the prosecutors who then made a decision not to charge her with whatever she was going to be charged with.

The prosecutor noted that Ms. Peveler was charged with a Class A felony.  The trial court viewed a portion (forty-five minutes) of the proffer during the recess and asked trial counsel the evidentiary basis for it to be played to the jury.  Trial counsel then responded that it was for impeachment.  Trial counsel stated:

- 35 -

The evidentiary vehicle, Judge, is we have a right to, under the rules cited, under 613, we have - - I don't want to cite the rule off the top of my head and get it wrong, Judge. Under 616, "evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness, "so it goes to that video that is - - can be impeachment by bias or prejudice. And the rule allows me to use extrinsic evidence, which is the videotape of that.

In denying Defendant's request to play the proffer, the trial court made the following findings:

Okay. This is an interesting issue. Again, I've had an opportunity to listen to about 45 - - 40 or 45 minutes. If it comes in, it should come in under Rule 616 and 803.26.

Now, 803.26 comes in, it's got to come in under Rule 613(b). And under Rule 613(b), it's clear: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and that the opposite party is afforded an opportunity to interrogate the witness thereon."

Well, this is a proffer. And a proffer is when an attorney offers testimony of a client to the law enforcement or district attorney's office or the prosecutor to assist in an investigation, possibly to assist in favorable treatment for the client.

Now I have no problem under the setup here, the fact that Mr. Warlick questioned his client. He knew what the subject matter was more than the district attorney did at this particular point. He had a rapport with Defendant - - or Ms. Peveler, and in some occasions he went into more detail - - they went into more detail on matters then we heard here in court. And there was no undue influence or pressure or undue leading.

If there was any coaching, it was only coaching to tell the truth. And one occasion he reminded her that's rule number one and what's rule number two and rule number three. Rule number one was to tell the truth; rule number two was to listen to the questions; and rule number three was to tell the truth. And on another occasion she said, "Say that again." And

he said, "Good. That's what I told you to do. If you don't understand, I want you to say that."

A couple of times she would go, "um-hmm," not answer questions, and he would remind her that, you know, this can be a transcription too, although we're recording, and that doesn't transcribe very well. You need to make a response.

On probably the most glaring example that I could see, he jumped in - - after she said something to the effect, like, I don't know," he said, "That's the right answer. If you don't know, say so, I don't want you guessing."

There's nothing in there that gives any indication of undue influence, undue coaching, other than to tell the absolute truth.

Again, it goes into more detail, the 45 minutes that I saw, than anything that we heard today and it appears to me that a lot of that is rehashing exactly the same thing that we've gone over in more detail.

If there are any inconsistent statements in there, and I'm sure there are - - on one occasion he cleared that up on down the line about the person that - - Marlon, he said, "You didn't know who you got the pills from," and cleared that up with her. And she said, "The person I knew to get pills from." And he reminded her about Marlon. And after she mentioned that that was inconsistent, it was just a matter to kind of cut through the statement and get to the true subject matter.

Therefore, my ruling is based on 803.26 and 613(b). 616, I don't see it's admissible here to show bias or prejudice because I really don't know if it shows bias or prejudice. It's pretty consistent except for those points, and those things can be brought out on cross-examination. And if those matters are denied, then we can play them on the screen.

Therefore my ruling, [trial counsel] will be to follow Rule 803.26 and 613(b). If she denied particular questions, you have wide latitude here for cross-examination. There's so much that you can cross-examine her on

up to this point, even from this tape, that you could do without playing and even setting the stage for Rule 613.

So my ruling will be that the entire video will not be played unless it's brought out with the proper questions from 803.26 and 613(b). So let's bring them in.

In the video recording of the proffer, Ms. Peveler answers questions asked by her attorney, Mr. Warlick. In response to a detailed line of questioning, Ms. Peveler explained the events leading up to and following the victim's death. She was asked about her relationship with Defendant and how he treated his own children. Ms. Peveler denied ever seeing Defendant mistreat his children. She also denied any knowledge of Defendant's prior criminal record.

In the proffer, Ms. Peveler said that she had seen Defendant inject Dilaudid on occasions in her presence but he did not use drugs in front of her children. Ms. Peveler testified about the specific events of October 29, 2010, which was similar to her testimony at trial. Ms. Peveler admitted that she initially lied to police by telling them that the victim was never left alone with Defendant. She said that Defendant told her to say that she never left the victim alone with him because he knew that he could lose his children and go to jail. Ms. Peveler eventually told police and her husband, Chad Peveler, what she said actually happened.

We agree with the State that the substance of the proffer by Ms. Peveler is hearsay under Rule 801 of the Tennessee Rules of Evidence. We find that the video recording of Ms. Peveler's proffer does not support Defendant's allegation of bias or prejudice. Also, Defendant does not show in his brief how the proffer shows bias or prejudice. We also note that the trial court did not preclude Defendant from using the proffer during Ms. Peveler's cross-examination to establish a prior inconsistent statement. Therefore, this issue is without merit.

**Sufficiency of the Evidence**

Defendant contends that the evidence was insufficient to support his convictions for reckless homicide and aggravated assault. More specifically, he asserts that the proof shows that the victim was injured by someone else and that the jury's verdicts were inconsistent. We disagree.

- 38 -

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Id. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011).

Reckless homicide is statutorily defined as "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (2010). As instructed in this case, a person commits aggravated assault who:

(1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:

(A) Causes serious bodily injury to another; or

.     .     .

(2) Recklessly commits an assault as defined in § 39-13-101(a)(1), and:

(A) Causes serious bodily injury to another[.]

Tenn. Code Ann. § 39-13-102(a)(1)(A)-(2)(A) (2010). A person commits assault who intentionally, knowingly or recklessly causes bodily injury to another. Tenn. Code Ann. § 39-13-101(a)(1) (2010).

*Jury Verdict on Aggravated Assault*

- 39 -

Before addressing the question of the sufficiency of the evidence, we must first address an issue with regard to Defendant's conviction for aggravated assault. As recognized by the State, the trial court's instruction on aggravated assault as a lesser included offense of aggravated child abuse included the elements of both intentional[2] or knowing aggravated assault under Tennessee Code Annotated section 39-13-102(a)(1)(A) and reckless aggravated assault under section 39-13-102(a)(1)(B). Although the jury found Defendant guilty of the lesser included offense of aggravated assault, the jury's verdict did not distinguish by which *mens rea* the offense was committed. The verdict form did not differentiate between Class C felony aggravated assault (intentional or knowing) and Class D felony aggravated assault (reckless), and the announcement of the jury's verdict by the jury foreman did not indicate which *mens rea* it found applicable. Following sentencing, however, the trial court entered a judgment reflecting a conviction for intentional or knowing aggravated assault, a Class C felony, and imposed a six-year sentence for that offense.

A defendant has a constitutional right "to a unanimous verdict before a conviction of a criminal offense may be imposed." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Because the jury's verdict did not reflect the *mens rea* with which it found Defendant acted, it is unclear whether the jury unanimously found that the Defendant either intentionally or knowingly assaulted the victim causing serious bodily injury. The State concedes that, because of this deficiency in the jury's verdict, the Defendant's judgment of conviction for Class C felony aggravated assault cannot stand, and we agree.

Both the State and Defendant assert that the appropriate remedy is for this court to modify the judgment to reflect a conviction for Class D felony reckless aggravated assault, rather than remand the case for a new trial. In this case, the jury was correctly instructed as to the meaning of intentionally, knowingly, and recklessly and was further instructed that "[t]he requirement of 'recklessly' is also established if it is shown that Defendant acted intentionally or knowingly." See Tenn. Code Ann. § 39-11-301(a)(2) (2013). "Reckless" is a lesser included mental state of "knowing," State v. Gilliam, 901 S.W.2d 385, 390-91 (Tenn. Crim. App. 1995), and it is well established that "Class D felony reckless aggravated assault is a lesser included offense of . . . Class C felony intentional or knowing aggravated assault." State v. Nathaniel Shelbourne, No. W2011-

---

[2] We note that *intentional* aggravated assault was not a proper lesser included offense of aggravated child abuse under the controlling case law at the time of trial and should not have been charged to the jury. See State v. Honeycutt, 54 S.W.3d 762 (Tenn. 2001).

02372-CCA-R3-CD, 2012 WL 6726520, at *5 (Tenn. Crim. App. Dec. 26, 2012), no perm. app. filed (citing State v. Raul T. Garcia, No. E2000-02817-CCA-R3-CD, 2001 WL 856598, at *2 (Tenn. Crim. App. July 31, 2001)). Because the *mens rea* of "reckless" is a lesser *mens rea* of intentional or knowing, we conclude that the jury was unanimous in finding, at a minimum, that Defendant was guilty of reckless aggravated assault.

Initially, we were reluctant to simply modify Count 2 to reflect a conviction for reckless aggravated assault because there was sufficient evidence presented to the jury to support a conviction for a Class C felony, knowing aggravated assault. However, on rare occasion, our court has modified a conviction even when that conviction was supported by sufficient evidence. In State v. Holland, our court stated:

> We, therefore, find ample evidence to support the jury finding of each of the elements of especially aggravated burglary. However, although neither side has raised the issue, we are compelled by statute to modify the especially aggravated burglary conviction[3] to one of aggravated burglary. Tennessee Code Annotated Section 39-14-404(d) provides that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." Tenn. Code Ann. § 39-14-404(d) (1991 Repl.) [] Subsection (d) prohibits using the same act to prosecute for especially aggravated burglary and another offense. By virtue of the prosecution and conviction of Holland for aggravated rape, the statute prohibits his prosecution and conviction for especially aggravated burglary. See State v. [] Oller, 851 S.W.2d 841 (Tenn. Crim. App. 1992).

> Accordingly, Holland's conviction for especially aggravated burglary is modified to a conviction for aggravated burglary, a class C felony. Tenn. Code Ann. § 39-14-403 (1991 Repl.). Because we have sustained the trial judge's findings regarding sentencing, we impose a ten year sentence and modify the fine to the maximum under the class, $10,000. Tenn. Code Ann. §§ 40-35-111(b)(3) & -112(b)(3) (1990 Repl.). Our sua sponte modification of the conviction, sentence, and fine is necessary, we believe, to do substantial justice in this case. [(Citations omitted)].

---

[3] Tennessee Code Annotated section 39-14-404(d) provides a prohibition against certain prosecution but did not, on its face, compel the modification made in Holland. See Tenn. Code Ann. § 39-14-404(d).

- 41 -

State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Tennessee Rule of Appellate Procedure 36(b) provides, in part, that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Although in Holland, our court based the modification on a statutory prohibition as opposed to an error in the verdict form, we now determine that Holland provides authority for this court to modify convictions, even convictions supported by sufficient evidence, to do substantial justice. In this case, the jury verdict was not sufficiently clear to support the conviction imposed by the trial court. Although it is not possible to determine if all of the jury agreed that Defendant knowingly assaulted the victim causing serious bodily injury, we can determine that, at a minimum, the jury found that Defendant recklessly assaulted the victim causing serious bodily because the jury determined that Defendant was guilty of aggravated assault. Also, as we discuss below, there was sufficient evidence to support a conviction for reckless aggravated assault. The fact that both the State and Defendant argued for modification of the conviction to reckless aggravated assault, although not controlling, is persuasive. These facts indicate to us that the rights of Defendant and the interest of the public would be protected by imposition of a conviction for reckless aggravated assault in Count 2. Therefore, in order to do substantial justice, we modify Defendant's conviction in Count 2 to reckless aggravated assault, a Class D felony. See Tenn. R. App. P. 36(b). On appeal, Defendant did not claim that the trial court erred in sentencing Defendant to six years' incarceration, the maximum sentence for a Range I standard offender convicted of Class C felony aggravated assault. Consequently, and as the court did in Holland, we *sua sponte* modify Defendant's sentence in Count 2 to four years' incarceration. See Holland, 860 S.W.2d at 60.

*Evidence Supporting Convictions for Reckless Homicide*
*and Reckless Aggravated Assault*

When viewed in the light most favorable to the State, we conclude that the evidence is sufficient to support Defendant's convictions for reckless homicide and reckless aggravated assault. The jury obviously accredited the testimony of Amber Peveler, who testified that she left the nine-month-old victim with Defendant while she went to purchase narcotics for Defendant on October 29, 2010. The victim was awake when Defendant took her into his apartment still strapped inside of her infant carrier, and

Ms. Peveler was talking to her. Cell phone records supported Ms. Peveler's account that she drove to Walmart in Hendersonville. There she met Marlon Thompson and purchased six Dilaudid pills. When Mr. Thompson asked about the victim, Ms. Peveler told him that the victim was with Defendant.

Ms. Peveler arrived back at Defendant's apartment, and Defendant walked outside to meet her. When Ms. Peveler walked inside the apartment, she saw the victim asleep in her infant carrier. She then asked Defendant to lay the victim down in the back bedroom while she cooked. Defendant later received a phone call and announced that they needed to "meet a guy to buy the pills." Ms. Peveler walked into the back bedroom to get the victim and immediately noticed that "something wasn't right." She noted that the victim was lying at an angle on her back in the bed. Defendant had placed a pillow on the right side of the victim, and there was a pillow over her head. Ms. Peveler found it strange that the victim was covered with a blanket up to her chest but her arms were outside of the blanket down to her side. Ms. Peveler tried to wake the victim, but the victim was unresponsive. She opened the victim's eyelids and noticed that her pupils were extremely dilated. Ms. Peveler carried the victim into the hallway and told Defendant that something was wrong with the victim. Defendant indicated that he thought Ms. Peveler was joking. He then looked at the victim and walked into the kitchen to get a cup of water. He sprinkled some water in the victim's face, but she did not move. Defendant began performing CPR on the victim, and Ms. Peveler suggested that they call for an ambulance. However, Defendant said that they would drive the victim to the hospital in Hendersonville. Colby Carroll, a nurse a Hendersonville Medical Center, testified that when the victim was first brought into the emergency room, Defendant came running through the door while she and Dr. Harrison were treating the victim and began yelling and cursing. Ms. Carroll said that Defendant was "just very, very aggressive." She also noted that Defendant never looked at the victim. Dr. Harrison asked that Defendant be removed from the room.

While Ms. Peveler and Defendant were at the hospital, Defendant suggested that they tell everyone that Ms. Peveler had the victim the entire time and that she never left the victim with Defendant. He wanted Ms. Peveler to say that they were going to get pizza when Ms. Peveler found the victim unresponsive. Defendant also wanted Ms. Peveler to say that she put the victim down for a nap. A CT scan was performed on the victim, and it was determined that she was bleeding from the left side of her brain and that she was having seizures. The victim was then taken by LifeFlight to Vanderbilt Children's Hospital. The victim was pronounced brain dead after arriving at Vanderbilt.

Dr. Fleming testified that the victim had a subdural hematoma or blood clot on her brain caused by trauma. She evaluated the victim who had been declared brain dead. It was Dr. Fleming's opinion that the victim suffered "abusive head trauma" and that the "most likely mechanism for all of these things [was] some combination of shaking or impact of her head against a hard surface." Dr. Fleming also noted that the victim had bruises on her face, buttocks, vaginal area, chest, inner thigh, and her knee. Dr. Fleming testified that the victim had retinal hemorrhages, and part of the retina was "torn off the back of the inside of the eye, and that is almost never seen in anything other than abusive head trauma." It was Dr. Fleming's opinion that the victim would not have been "acting normally" after her injuries happened. She also opined that the victim's injuries occurred within the day, probably within 12 to 18 hours at the most prior to the time that she showed up in the hospital." Dr. Fleming testified that she had seen injuries similar to the victim's from a horrific car accident or a fall from a second or third story building.

Dr. Bridget Eutenier, who performed an autopsy on the victim testified that the cause of the victim's death was blunt force injuries to the victim's head. There were three contusions to the victim's head that were indicative of "some force applied, some impact" of the victim's head, and there was evidence of blunt force injury to the victim's torso. Dr. Eutenier estimated that the victim's injuries occurred two to three days prior to the victim's "metabolic death," when her organs were harvested. Therefore, the injuries would have occurred on October 29 or 30, 2010. Dr. Eutenier testified that the victim's injuries were consistent with a fall from a third floor window and that the victim would not have acted normally after the injuries occurred. In addition to the blunt force injuries, Dr. Eutenier could not rule out "acceleration-deceleration injuries."

Marlon Thompson affirmed that he met Ms. Peveler on the afternoon of October 29, 2010, at the Hendersonville Walmart to sell her some Diluadid pills. He said that L.P. was with Ms. Peveler but he did not see the victim.

Defendant contends that because the victim had older bruises on her jaw and buttocks that occurred before her death, her fatal injuries were "inflicted by someone else, likely the co-defendant/mother, Amber Peveler, prior to Ms. Peveler's short absence from the residence." Although the evidence showed that the victim had bruising prior to her death, Dr. Eutenier's testimony was clear the victim died from blunt force injuries to her head that would have occurred on October 29, 2010. She also testified that the victim would not have acted normally after sustaining the injuries. Therefore the evidence is sufficient to support convictions for reckless homicide and reckless aggravated assault.

Defendant also asserts that the jury verdicts in this case are inconsistent. He makes the following argument:

> In Count I, reckless homicide, the jury found [Defendant] acted with the mental state of reckless. In Count II – aggravated assault, the prerequisite mental state for aggravated assault is intentional or knowingly. The jury verdict is inconsistent in that it returned a verdict with two different mental elements. Both crimes happened at the same time. [Defendant] asserts that there was no evidence to support a conviction on either count but especially Count II.

Defendant cites no authority in support of this argument. Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on [.]" Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also State v. Sanders, 842 S.W.2d 257 (Tenn. Crim. App. 1992) (determining that issue was waived where defendant cited no authority to support his complaint).

In any event, this issue is without merit. Inconsistent jury verdicts are not a basis for relief. State v. Davis, 466 S.W.3d 49, 76 (Tenn. 2015); see, e.g., State v. Watkins, 362 S.W.3d 530, 558 (Tenn. 2012) (affirming Defendant's convictions for reckless homicide and aggravated child abuse which were based upon differing mental states ("reckless" v. "knowing")). Defendant is not entitled to relief on this issue.

**Double Jeopardy and Merger**

Defendant argues that principles of double jeopardy require the trial court to merge his sentences for reckless homicide and aggravated assault because the "two convictions arose out of the same event and were, thus, a single criminal offense."

*Blockburger Analysis*

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second

- 45 -

prosecution following conviction; and (3) multiple punishments for the same offense. See State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The present case involves the third category. When a defendant complains that prosecution inflicts multiple punishments for the same offense, then a court must employ the Blockburger analysis. Id. at 556 (adopting the standard announced in Blockburger v. United States, 284 U.S. 299, 304 (1932)).

Pursuant to the Blockburger test, the threshold inquiry is whether the defendant's convictions arose from the same act or transgression. Id. at 545. If the convictions do not arise from the same act or transgression, the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends. Id. If, however, the convictions arose from the same act or transgression, the court must then determine whether the legislature intended to allow the offenses to be punished separately. Id. at 556. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. Id. at 557. "The court makes this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." State v. Cross, 362 S.W.3d 512, 519 (Tenn. 2012). "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes," and courts "will presume that the Legislature intended to permit multiple punishments." Watkins, 362 S.W.3d at 557.

Pursuant to Watkins, we have examined the charging instrument and the relevant statutes, and we have considered whether the charges arise from a single act or transgression. See id. at 545. The record shows that the crimes occurred on the same day and in the same location. The two offenses at issue, reckless homicide and reckless aggravated assault, clearly arose from the same conduct. Therefore, Defendant's double jeopardy claim survives our threshold inquiry. "If the convictions do arise from the same transaction, the question becomes whether each offense includes an element the other does not—if so, there is a presumption that the General Assembly intended to permit multiple punishments; if not, the presumption is that multiple punishments are not permitted." State v. Feaster, 466 S.W.3d 80, 84 (Tenn. 2015) (citing Watkins, 362 S.W.3d at 557).

Under Tennessee Code Annotated section 39-13-215(a), reckless homicide is "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (2010). As relevant here, "[a] person commits aggravated assault who . . . [r]ecklessly commits an assault as

- 46 -

defined in § 39-13-101(a)(1), and . . . [c]auses serious bodily injury to another[.]" Tenn. Code Ann. § 39-13-102(a)(2)(A) (2010).[4] At the time of the offense, "serious bodily injury" was defined as including a "substantial risk of death," "[p]rotracted unconsciousness," "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty," or "[a] broken bone of a child who is eight (8) years of age or less." Tenn. Code Ann. § 39-11-106(a)(34) (2010).

In addressing the double jeopardy issue at sentencing, the trial court in this case noted, "The elements are different. One is killing; the other is an assault." We acknowledge a split of authority within our court on the issue of whether the element of "killing" necessarily includes the element of serious bodily injury. In State v. John C. Walker, III, this court determined that "the unlawful killing of a person is a crime distinctly different from that of an assault upon a person." John C. Walker, III, No. M2005-01432-CCA-RM-CD, 2005 WL 1798758, at *11 (Tenn. Crim. App. July 28, 2005), perm. app. denied (Tenn. Dec. 19, 2005) (applying the test identified in Tenn. Code Ann. § 40-18-110(f)(1) to conclude that aggravated assault is not a lesser included offense of first degree murder); see also State v. William Matthew Black, No. M2013-00612-CCA-R3-CD, 2014 WL 1669965, at *13 (Tenn. Crim. App. Apr. 25, 2014), perm. app. denied (Tenn. Sept. 22, 2014) (citing John C. Walker, III in its conclusion that the trial court did not commit plain error in refusing to instruct aggravated assault as a lesser included offense of first degree murder). Conversely, this court determined in State v. Paul Graham Manning that "[a] killing certainly includes serious bodily injury (as well as 'mere' bodily injury)" and, therefore, aggravated assault and assault are lesser included offenses of first degree murder. Paul Graham Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *6 (Tenn. Crim. App. Feb. 14, 2014), perm. app. denied (Tenn. Dec. 15, 2003); see also State v. Alexis Mason, No. W2010-02321-CCA-R3-CD, 2013 WL 1229447, at *19-20 (Tenn. Crim. App. Mar. 27, 2013), perm. app. denied (Tenn. Sept. 16, 2013) (concluding that reckless aggravated assault was a lesser included offense of facilitation of first degree premeditated murder based upon Paul Graham Manning).

We agree with the conclusion reached by the court in John C. Walker, III that "the unlawful killing of a person is a crime distinctly different from that of an assault upon a

_____

[4] We note that "Boomer's Law," which became effective on July 1, 2013, (after the date of the offenses in this case) added "death" as one of the results of an intentional, knowing, or reckless assault that can elevate the offense to aggravated assault. See 2013 Tenn. Pub. Acts, c. 461, § 1.

person." See also United States v. Good Bird, 197 F.3d 1203, 1205 (8th Cir. 1999) ("[A]lthough 'serious bodily injury' is an element of assault . . . it is not an element of murder . . . and . . . 'assault resulting in serious bodily injury and second degree murder are completely separate offenses[.]'"). Accordingly, we hold that reckless aggravated assault contains an element (serious bodily injury) not contained in the reckless homicide statute and that reckless homicide contains an element (killing) not required for a conviction for reckless aggravated assault. Therefore, Defendant's convictions for both reckless homicide and reckless aggravated assault can stand under the Blockburger double jeopardy analysis.

### Burns Part (b) and Reconsideration in Light of Glen Howard

Although we have concluded that separate convictions for reckless homicide and reckless aggravated assault do not violate double jeopardy under the Blockburger elements test, we note that, if one offense is a lesser[-]included of the other, there is a presumption that multiple convictions were not intended by the General Assembly and that multiple convictions violate double jeopardy. Watkins, 362 S.W.3d at 557. Upon our initial consideration of this issue, we noted that because all of the statutory elements of reckless aggravated assault were not included within the statutory elements of reckless homicide, reckless aggravated assault *was not* a lesser[-]included offense under Tennessee Code Annotated section 40-18-110(f). However, we noted that if we applied the test from State v. Burns, 6 S.W.3d 453 (Tenn. 1999)[5] we would be constrained to

---

[5] Pursuant to Burns, an offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
> > (1) a different mental state indicating a lesser kind of culpability; and/or
> >
> > (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of

conclude, under <u>Burns</u> part (b), that reckless aggravated assault *was* a lesser[-]included offense of reckless homicide because it contained a statutory element establishing a less serious harm (serious bodily injury versus death) to the same person, <u>Burns</u>, 6 S.W.3d at 466, and thus, dual convictions would violate double jeopardy. <u>See</u> <u>Watkins</u>, 362 S.W.3d at 557.

Based upon the reasoning in <u>State v. John J. Ortega, Jr.</u>, No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *11 (Tenn. Crim. App. Apr. 23, 2015) and <u>State v. Glen B. Howard,</u> No. E2014-01510-CCA-R3-CD, 2015 WL 4626860, at *15 (Tenn. Crim. App. Aug. 4, 2015), wherein this court held that the 2009 amendment of Tennessee Code Annotated section 40-18-110 abrogated part (b) of the <u>Burns</u> test, we concluded that reckless aggravated assault *was not* a lesser[-]included offense of reckless homicide under Tennessee Code Annotated section 40-18-110(f)(1) and that dual convictions were proper. Following the release of our opinion in this case, the Tennessee Supreme Court reversed in part <u>Glen B. Howard</u> and held that the 2009 amendments to Tennessee Code Annotated section 40-18-110 did not abrogate part (b) of the <u>Burns</u> test. <u>Howard</u>, __ S.W.3d __, 2016 WL 5933430, at *1, 6. The supreme court then granted Defendant's application for permission to appeal and remanded Defendant's case to this court for reconsideration in light of the supreme court's opinion in <u>Howard</u>.

Upon reconsideration, we hold that reckless aggravated assault is a lesser[-]included offense of reckless homicide under part (b) of the <u>Burns</u> test as reckless aggravated assault fails to meet the definition of a lesser[-]included offense of reckless homicide under <u>Burns</u> part (a) only in the respect that it contains a statutory element establishing a less serious harm (serious bodily injury versus death) to the same person.

---

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

<u>Burns</u>, 3 S.W.3d at 466-67.

Burns, 3 S.W.3d at 466-67.  Accordingly, Defendant's conviction for reckless aggravated assault must merge into the conviction for reckless homicide.  See Watkins, 362 S.W.3d at 557.

## Consecutive Sentencing

Defendant also argues that the trial court erred by ordering his sentences to be served consecutively.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness.  State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012).  In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment.  See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98.  The burden is on the appellant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Our supreme court has also extended the standard of review enunciated in State v. Bise, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). Tennessee Code Annotated section 40-35-115 sets forth the factors that are relevant in determining whether sentences should run concurrently or consecutively. The trial court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory factors exist. Tenn. Code Ann. § 40-35-115(b). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2).

In Pollard, the court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Pollard, 432 S.W.3d at 862. "So long as a trial court properly articulates its reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id.; Bise, 380 S.W.3d at 705.

In this case, the trial court found one statutory factor to support the imposition of consecutive sentencing. The trial court found that Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. With regard to the court's finding that Defendant was a "dangerous offender," the trial court further found that consecutive sentences were reasonably related to the severity of the offenses committed and were necessary to protect the public from further criminal conduct by Defendant, as required by State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). We conclude that the trial court did not abuse its discretion in imposing consecutive sentences. However, as discussed above, Defendant's conviction for reckless aggravated assault must merge into his conviction for reckless homicide, resulting in a total effective sentence of four years.

## Conclusion

For the reasons stated herein, we affirm Defendant's conviction and sentence for reckless homicide. We modify the judgment of conviction for aggravated assault in Count 2 to reflect that the Defendant is convicted of reckless aggravated assault, a Class D felony. Upon reconsideration of this case in light of Howard, Defendant's conviction

- 51 -

for reckless aggravated assault must merge into the conviction for reckless homicide based on double jeopardy principles. The case is remanded to the trial court for entry of amended judgments of conviction consistent with this opinion.


_____

ROBERT L. HOLLOWAY, JR., JUDGE